IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **RACHEL B. HOBBS**, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. **3:10-CV-169-L** |
| | § | |
| **KETERA TECHNOLOGIES, INC.**, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is Defendant's Motion for Summary Judgment (Doc. 26), filed March 18, 2011; and Defendant's Objections and Motion to Strike Portions of Declaration of Rachel B. Hobbs (Doc. 40), filed May 26, 2011. After carefully reviewing the motions, briefing, appendices, evidence, record, and applicable law, the court **grants** Defendant's Motion for Summary Judgment and **dismisses with prejudice** Plaintiff's claims for breach of contract, quantum meruit, promissory estoppel, and violations of Title VII, the Texas Commission on Human Rights Act ("TCHRA"), and the Family Medical Leave Act ("FMLA"). Defendant's Objections and Motion to Strike Portions of Declaration of Rachel B. Hobbs are **overruled** and **denied as moot**.

## I.    Factual and Procedural Background

Plaintiff Rachel B. Hobbs ("Hobbs" or "Plaintiff") filed this action on January 28, 2010, against her former employer Ketera Technologies, Inc. ("Ketera" or "Defendant") for sex and pregnancy discrimination under Title VII, 42 U.S.C. § 2000 *et seq*. and the TCHRA; interference and

retaliation under the FMLA; breach of contract; quantum meruit; and promissory estoppel.[1]  Hobbs seeks damages for lost wages, unpaid commissions, punitive damages, attorney's fees, and other costs.

Ketera is a small software company located in Silicon Valley, California.  According to Hobbs's First Amended Complaint (the "Complaint"), she was employed by Ketera or its predecessor from approximately April 2, 2007, to March 3, 2009, and worked remotely from her home in Texas.  Hobbs started in an "enterprise" or "direct sales" position as a director of enterprise sales at a base salary of $120,000 annually.  Compl. 2, ¶ 9.  In addition to a base salary, Hobbs was eligible for commissions and incentive compensation, otherwise referred to as quota achievement bonuses for each quarter in which quotas were met.  Payment of commissions and incentive compensation  was contingent on Ketera being able to collect from its customers for sales made.  To be eligible for commissions, Hobbs also had to be employed by Ketera when payments were received from customers.  These and other terms, including Ketera's reservation of the right to adjust or withhold compensation if circumstances in Hobbs's conduct or territory warranted it, were included in a 2007 compensation plan signed by Hobbs.

Hobbs's 2007 compensation plan set her quarterly sales quotas in 2007 for the second, third, and fourth quarters at $300,000, $540,000, and $610,000, respectively, making Hobbs's total 2007

---

[1] The court notes that the first page of Plaintiff's First Amended Complaint lists Hobbs's claims and includes a claim for unjust enrichment; however, the body of the Complaint does not address her unjust enrichment claim, and no factual allegations are made in support of the claim.  The court therefore concludes that Plaintiff does not intend to pursue a claim for unjust enrichment.  Ketera also asserts in its summary judgment motion that Hobbs "voluntarily dismissed her Texas Labor Code claim based on the transfer to the Channel Sales position because it was barred by limitations."  Def.'s Mot. 11.  Hobbs most recent pleading, however, that was filed after Ketera filed its Motion for Summary Judgment, includes a claim for sex discrimination under the TCHRA.  As herein explained, the court addresses Hobbs's discrimination claim under the TCHRA in conjunction with her discrimination claim under Title VII, since the standard applicable to both is the same.

annual quota $1,450,000.  Hobbs's quotas for 2007 were prorated to account for her March 2007, start date with Ketera.

Hobbs's direct sales compensation plan for 2008 was substantially the same as that for 2007 except that Hobbs was required to meet a quarterly quota of $450,000 in sales.  It is undisputed that Hobbs did not meet any of her quotas from April 2007 to the second quarter of 2008 while working as an enterprise or direct salesperson.  According to a record produced by Ketera and relied on by Hobbs, the following percentages of sales quotas were achieved by Hobbs from 2007 to 2008 while she was employed as an enterprise or direct salesperson:

| Quarter | % Quota Achieved |
| --- | --- |
| Q2 2007 | 39% |
| Q3 2007 | 21% |
| Q4 2007 | 16% |
| Q1 2008 | 27% |
| Q2 2008 | 0% |

Pl.'s Resp. App. 15.  This and another record reflect that only sales for new accounts were considered in calculating quarterly percentages of quotas achieved by Hobbs while she was in direct sales.  *See id.*; Pl.'s Resp. App. 12.  Credit was not given for "renewal" or "up sell" sales.  *Id.*

In April 2008, Hobbs informed her then-supervisor Tom Webb ("Webb") that she was pregnant.  During this conversation, Webb indicated that he was going to wait to tell the other executive staff team members about Hobbs's pregnancy.  In the summer of 2008, Hobbs met with Webb and Leslie Cedar ("Cedar"), Hobbs's former supervisor.  Hobbs acknowledges that no one at Ketera made negative comments to her about being pregnant but contends that during this meeting she was advised by Webb and Cedar for the first time that her attitude had changed for the worse.

It was during this meeting that Webb and Cedar also first talked to Hobbs about moving her from direct sales to channel sales.  Hobbs does not recall whether Webb and Cedar explained to her at that time their reasons for wanting to move her into the channel sales department.  Hobbs did not state at the time whether she would be open to considering a move to channel sales.

Sometime later that summer but before the third quarter of 2008, Hobbs had another conversation with Webb that she secretly recorded.  In that telephone conversation, Webb again raised the issue of moving Hobbs to channel sales.  Hobbs asked how the decision was being made as to whom at Ketera would be moved and how pay cuts were being determined.  Hobbs was particularly interested and pressed Webb to explain why Ketera had decided to move Hobbs to a channel sales position, which paid a lower base salary, while permitting her male counterpart, Eric Blando ("Blando"), to continue working in direct sales.

Blando joined Ketera on December 17, 2007, several months after Hobbs.  Four other male enterprise salespersons were hired by Ketera around the same time Hobbs was hired.  At the time of the recorded conversation, however, Blando was the only male enterprise salesperson still employed by Ketera.  One of the other four male enterprise salespersons, Charlie Coltman was fired on July 9, 2007, for "performance" reasons.  Pl.'s Resp. App. 14.  It is unclear why the other two male enterprise salespersons left the company, but it appears that they left of their own accord.

Ketera's records reflect that Coltman only had sales of $12,672 and met 0% percent of his sales quotas in 2007, but there is no evidence in the record regarding his required quotas for the first three quarters of 2007. Blando's sales record at this time were similarly low.  Blando's quota for 2008 was $1.6 million, but he only achieved 6% percent of his quota in the first quarter of 2008, and 0% the second quarter.

Webb avoided Hobbs's question about Blando during the recorded conversation and instead focused on the company's need to reduce costs in the form of salaries because the company's overall performance, including Hobbs's performance, with regard to new account sales was dismal, and as a result, the company was "upside down" financially.  According to Webb, Ketera sales were not keeping pace with the salaries paid to the company's sales employees.  Webb also told Hobbs that over the past twelve months, management at Ketera had become increasingly frustrated with Hobbs's attitude.  Webb stated that Ketera chief executive officer Steven Savignano ("Savignano") was particularly unhappy with Hobbs as a result of what Webb referred to as miscommunications between Savignano and Hobbs.  Hobbs acknowledged this fact.

Savignano was opposed to the idea of transferring Hobbs to another position and instead preferred to fire her but ultimately left the decision to Webb.  In response to Hobbs's question "So why haven't I been let go"?, Webb explained that although "performance is not great pretty much across the board," he and some others believed Hobbs had skills and value to contribute to the company in some fashion.  Webb acknowledged that there had only been a couple of people in the history of the small company who had been successful in sales.  One of those persons was Cedar and, like it or not, the bar was set fairly high for other sales employees based on Cedar's performance.

Hobbs ultimately agreed to move to channel sales but did not believe that she had any real choice in the matter.  She was allowed to grandfather some of her accounts, including an account with Service Master, and she continued to receive commissions.  Her annual salary, however, was reduced from $120,000 to $75,000.  Hobbs started her new position in channel sales in the third quarter of 2008, during which her quarterly quota was reduced to $400,000.  Hobbs achieved 7% of her sales quota the third quarter of 2008.  In the fourth quarter, however, she achieved 101% of her

quota due in large part to a sale made in conjunction with the Service Master account. Ketera's records reflect that this sale was a renewal. In her prior enterprise sales position, Hobbs was not credited for renewal sales for purposes of determining whether she met her sales quotas. As a channel salesperson, she was given credit for renewals that accounted for her achieving 101% of her quota in the fourth quarter of 2008 before taking maternity leave. *See* Pl.'s App. 12.

Hobbs went on maternity leave in mid December 2008. Before taking leave, Hobbs contends that she "conferred with and submitted information requested by Ketera Human Resources related to [her] request for FMLA protected leave." Compl. 4, ¶ 22. While Hobbs was out on maternity leave, Ketera fired Blando who had only met 5% of his sales quota in the third quarter of 2008 and 0% the final quarter. Around the same time Blando was let go in January 2009, Ketera rehired Coltman and another male employee, Mike Schwabrow, to work in the direct sales department as Enterprise Sales Directors at annual base salaries of $110,000.

As previously noted, Coltman worked for Ketera from February 2007, to July 2007. Ketera contends that although he was fired in 2007 for failing to meet his sales quota, a decision was made in 2009 to give him a second chance because of his positive attitude and eagerness to sell. Coltman's sales quotas for the second to fourth quarters in 2009 were set at $500,000, $600,000, and $700,000. The record reflects that Coltman achieved 0% of his quotas in 2009. There is nothing in the record regarding Schwabrow's quotas or sales record. Coltman's employment was terminated a second time in June 2009, for failure to meet his sales quotas. Schwabrow was let go shortly thereafter in September 2009, for the same reason.

Before returning to work from maternity leave, Hobbs had a telephone call with Savignano. According to Hobbs, Savignano was evasive when she inquired about her job status and preferred

instead to discuss the matter when she returned to work.  Compl. 4, ¶ 25.  Towards the end of her twelve-week leave, Hobbs requested and was given an additional two weeks leave until the end of February 2009.  It is undisputed that shortly after Hobbs returned to work, she was told by her new supervisor Sam Rapp that she was being terminated.

Ketera contends that Hobbs exhibited a poor attitude upon returning to work and failed to close any deals in the ten or so days after she returned to work.  Ketera maintains that Hobbs was discharged based on her poor attitude and weak sales record, as well as economic and financial reasons.  Ketera attempts to downplay Hobb's sales achievement in the fourth quarter of 2008 by contending that Hobbs needed and received a significant amount of assistance to make the sale.  Ketera also contends that the renewal sales such as the one made by Hobbs were not valued as highly by the company as new account sales.  Hobbs, on the other hand, asserts that Ketera discriminated and retaliated against her by reducing her pay, demoting her, and firing her because of her sex and pregnancy leave.  Hobbs contends that Ketera's reasons for firing her have changed and that this is evidence of pretext.  Hobbs further contends that Ketera wrongfully withheld commissions she had earned before leaving Ketera.

Ketera moved for summary judgment on all of Hobbs's claims on March 18, 2011.  Ketera denies that it retaliated or discriminated against Hobbs as a result her sex or pregnancy.  It further denies that it owes Hobbs any additional compensation for commissions allegedly earned.  Ketera also moved to strike portions of an affidavit by Hobbs on the grounds that it contradicts her deposition testimony and contains conclusory statements based on speculation.  In conjunction with its reply brief, Ketera also moved for leave to file a supplemental appendix that included deposition testimony of various witnesses who were deposed pursuant to Hobbs's request in late April 2011,

after Ketera filed its Motion for Summary Judgment.  Hobbs objected to the motion for leave on the grounds she would be prejudiced if not given the opportunity to respond to the supplemental evidence.  Because Hobbs had received the benefit of two extensions that impacted the parties' briefing and submission of evidence on the summary judgment motion and she relied on the same evidence in her response, the court granted Ketera's request for leave and permitted Hobbs to file a surreply by November 11, 2011.

## II.    Summary Judgment Standard

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party.  *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  "[When] the record taken as a whole could not lead

a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Id.* (citation omitted).  Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment.  *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996).  Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence.  *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim.  *Ragas*, 136 F.3d at 458.  Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment.  *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 832 (1992).  "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248.  Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion.  *Id.*  If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted.  *Celotex*, 477 U.S. at 322-23.

## III.    Analysis

Applying the relevant standard, the court determines that Ketera is entitled to summary judgment on all of Hobbs's claims, as no genuine dispute of material fact exists.

### A.      Sex and Pregnancy Discrimination Claim under Title VII and TCHRA

Ketera contends that it is entitled to summary judgment on Hobbs's discrimination claim because Hobbs cannot establish a *prima facie* case of discrimination and she has not come forward with evidence to rebut Ketera's evidence regarding pretext.  Ketera acknowledges in its motion that Hobbs has asserted a discrimination claim under Title VII and the TCHRA but does not differentiate between them in its analysis.   Because the court determines the same standard applies to discrimination claims under Title VII and the TCHRA, it considers Hobbs's discrimination claims under Title VII and the TCHRA together based on the standard applicable to Title VII claims.   *See Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 n.2 (5th Cir. 1999) (holding that law governing claims under the TCHRA, Texas Labor Code § 21.001 *et seq.* and Title VII is identical).

### 1.      Legal Standard for Title VII Discrimination Claims

Title VII of the Civil Rights Act of 1964 prohibits discrimination on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  "The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions. . . ." 42 U.S.C. § 2000e(k).  As Hobbs relies on circumstantial evidence of sex discrimination, her claim is analyzed using the modified *McDonnell Douglas* burden-shifting paradigm. *See Jackson v. Watkins*, 619 F.3d 463, 466 (5th Cir. 2010).

To survive a motion for summary judgment, a plaintiff in a Title VII discrimination case must first establish a prima facie case of discrimination by a preponderance of the evidence.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).  Once this prima facie case has been established, there is a

presumption of discrimination, and the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802-04.  If such a showing is made, the burden shifts back to the plaintiff to demonstrate that the articulated reason was merely a pretext for intentional discrimination.  *Id.*

The third step of the *McDonnell Douglas* test has been altered by the Supreme Court's decision in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) (holding that in Title VII cases, the mixed-motives theory of discrimination is available in cases with circumstantial evidence of discrimination).  In light of *Desert Palace*, the Fifth Circuit has modified the final step of *McDonnell Douglas*.  *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 411 (5th Cir. 2007).  To survive summary judgment under the modified *McDonnell Douglas* test, at the final step, a plaintiff must offer sufficient evidence to create a genuine dispute of material fact that either: (1) a defendant's reason for the employment action is not true, but is instead a pretext for discrimination, or (2) a defendant's reason, though true, is only one of the reasons for its conduct and that another "motivating factor" is the plaintiff's protected characteristic.  *Id.* at 411-12.

After a Title VII case reaches the pretext stage, the question to be decided for the resolution of a motion for summary judgment is whether a rational factfinder could find that the employer intentionally discriminated against the plaintiff on the basis of sex and pregnancy discrimination.  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).  A "plaintiff can survive summary judgment by producing evidence that creates a jury issue as to the employer's discriminatory animus or the falsity of the employer's legitimate nondiscriminatory explanation." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002), *cert. denied*, 539 U.S. 926 (2003).  "Pretext-plus" is

not required to support an inference of retaliatory discrimination.  *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 223 (5th Cir. 2000).  "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated," and may therefore be enough to prevent summary judgment or judgment as a matter of law.  *Reeves*, 530 U.S. at 148; *Sandstad*, 309 F.3d at 897.  This showing, however, is not always enough to prevent summary judgment "if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves*, 530 U.S. at 148.

With this framework in mind, the court proceeds to analyze the parties' arguments as to whether Hobbs has established a prima facie case and produced evidence to raise a genuine dispute of material fact that Ketera's alleged business reason for its decisions was a pretext for discrimination.  It is not entirely clear from Hobbs's Complaint or her response to Ketera's summary judgment motion, but it appears that she is claiming she was discriminated based on her sex and pregnancy as a result of the following, which the court addresses separately: (1) Hobbs's transfer to channel sales and decrease in pay in 2008; (2) Ketera's compensating Hobbs at a lower rate than male enterprise salespersons; and (3) Hobbs's termination in March 2009.[2]

---

[2] Hobbs's briefing is not a model of clarity.  She states at least twice that she "suffered two adverse employment actions": "1) a significant reduction in compensation [when she was moved to channel sales in 2008]; [and] 2) termination."  Pl.'s Resp. 19-20.  In the same paragraph, however, she appears to assert a third basis for discrimination by contending that Ketera discriminated against her when it "replaced" her with the two male enterprise salespersons that were hired in January 2009 at salaries of $110,000.  *Id.* at 20.

### 2.    Prima Facie Case

To establish a *prima facie* case of sex discrimination under Title VII, Hobbs must show: "(1) she is a member of a protected class; (2) she was qualified for the position she sought; (3) she suffered an adverse employment action; and (4) others similarly situated but outside the protected class were treated more favorably."  *Alvarado v. Texas Rangers*, 492 F.3d 605, 611 (5th Cir. 2007) (citations omitted).  Hobbs may also satisfy the fourth element by showing that she was replaced by someone outside the protected group.  *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007) (footnote omitted).  Evidence of general sex discrimination, however, is not probative of pregnancy discrimination, because the Pregnancy Discrimination Act requires courts to inquire whether the employer treats pregnancy or pregnancy-related conditions differently than other medical conditions.  *See Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 684 (1983) ("The 1978 Act makes clear that it is discriminatory to treat pregnancy-related conditions less favorably than other medical conditions."); *see also Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1060 (5th Cir. 1998).  Accordingly, the "inquiry is whether . . . [the] employer treats pregnancy or

---

Hobbs provides little or no explanation for this cryptic statement other than to state: "This was after defendant discriminatorily reduced Hobbs's compensation to $75,000 . . . but did not reduce male employees' salaries, nor did they bring in the new employees hired while Hobbs was on maternity leave [] at a lower rate." *Id.*  Hobbs additionally notes that she achieved 101% of her channel sales quota in the fourth quarter of 2008, but she fails to explain the connection between this achievement and Ketera's hiring two male enterprise salespersons. Although not required to do so, the court attempted to follow and piece together Hobbs's arguments and evidence.  Hobbs asserts in her Statement of Facts and declaration that she was returned to enterprise sales upon returning from maternity leave but Ketera did not return her annual salary to the same level she was previously paid in this position ($120,000) and did not increase her compensation to the same level as the two male enterprise salespersons hired by Ketera in January 2009 ($110,000).  Although this argument and evidence are not referred to in support of Hobbs's contention that she was "replaced," it appears that the two are related.  The court therefore considers this argument and evidence out of an abundance of caution, in addition to the two other specific adverse employment actions articulated by Hobbs.

pregnancy-related conditions differently than other medical conditions" and the appropriate "comparison is . . . between pregnant and nonpregnant workers [who requested leave or accommodations], not between men and women." *Id.* (quoting *E.E.O.C. v. Ackerman, Hood & McQueen, Inc.*, 956 F. 2d 944, 948 (10th Cir. 1992)).

Ketera focuses only on the second and fourth elements of a *prima facie* case. *Id.* Accordingly, for purposes of its analysis in ruling on Ketera's summary judgment motion, the court presumes that Hobbs has satisfied the first and third elements of her sex and pregnancy discrimination claims; however, because Hobbs argues only that she was treated differently from male co-workers[3] and presented no evidence in response to Ketera's motion to demonstrate that she was similarly situated to but treated differently from *nonpregnant* Ketera employees, the court determines that she has failed to establish a prima facie case of pregnancy discrimination, and her Title VII claim based on pregnancy discrimination fails as a matter of law.[4]   Ketera is therefore entitled to judgment on this claim.   Accordingly, the court's analysis addresses only whether Hobbs has a discrimination claim based on sex that can survive summary judgment.

---

[3] While there are weak references to the standard, the parties' briefs focus primarily on Ketera's allegedly different treatment of male and female employees rather than pregnant and nonpregnant employees.

[4] Hobbs argues that another female Ketera employee was similarly fired sometime after returning from pregnancy leave.   Ketera contends that this female employee held a different position than Hobbs and left under different circumstances, that is, she did not leave immediately upon returning to work after her pregnancy leave. Ketera also presented evidence that Cedar took pregnancy leave and returned to work without incident.   Again, however, this is not evidence of pregnancy discrimination, because there is no evidence regarding Ketera's treatment of nonpregnant employees to establish that it treated pregnant employees differently from nonpregnant employees.   Instead, Hobbs compares herself and the other pregnant employee with male employees without arguing or showing whether the male employees requested leave or other accommodations.

### a.      Transfer to Channel Sales and Decrease in Pay

Hobbs contends that Ketera's attitude towards her changed after it learned in April 2008, that she was pregnant.  More specifically, she asserts that Ketera moved her from enterprise sales to channel sales and reduced her annual salary from $120,000 to $75,000 based on her sex or pregnancy, whereas other low-performing male enterprise salespersons were allowed to remain in enterprise sales without a reduction in salary.  The court considers only whether Hobbs was discriminated based on her sex because, as previously explained, she failed to raise a genuine dispute of material fact as to whether Ketera treated pregnant employees differently from nonpregnant employees.

### i.      Hobbs's Qualifications for Enterprise Sales

Ketera contends that Hobbs was not qualified for an enterprise or channel sales position at Ketera because she failed to meet her sales quota every quarter from 2007 to 2008, except for the fourth quarter of 2008.  Hobbs does not dispute that she failed to meet her quota in six consecutive quarters but nevertheless contends she was qualified because she outperformed her male colleagues, generated a significant amount of revenue totaling $2,050,249 from 2007 to 2008, and closed a record-breaking deal in December 2008 with Service Master.  Hobbs also points to the deposition testimony of former supervisor Webb to support her argument that he "had a generally favorable perspective of Hobbs and believed based on her skills she could have been successful in channel sales."  Pl.'s Resp. 19.  In addition, she relies on the deposition testimony of Ryan Ashburn ("Ashburn"), who supervised her immediately prior to her maternity leave and described his working relationship with her as positive.  In addition, Hobbs relies on Webb's statement during the recorded

phone call that "She's gotten to know the stuff [Ketera's product] cold." *Id*. 19. Ketera replies that Hobbs's argument that she was the "best of the worst" is insufficient to demonstrate that she was qualified for either the enterprise or channel sales positions.

Both parties lump together their arguments regarding Hobbs's qualifications for the enterprise and channel sales positions. Since the responsibilities for the positions differed, the court addresses them separately in conjunction with each of Hobbs's claims that she suffered various forms of discrimination while employed as an enterprise salesperson and channel sales person. Because Hobbs was employed as an enterprise salesperson in 2008 when she contends Ketera demoted her to channel sales and reduced her annual salary from $120,000 to $75,000, the relevant inquiry for purposes of this claim is whether Hobbs was qualified for the enterprise sales position before being transferred to channel sales, not whether she was qualified for channel sales.

The record reflects that from 2007 to 2009, performance of salespersons at Ketera was based in large part on an employee's ability to meet his or her sales quotas, and accomplishing anything less than 100% was considered "below the bar." Def.'s Reply App. 7, p. 73-74. Indeed, even Hobbs contends based on having met her quota in Q4 2008, that she is qualified for the channel and enterprise sales positions. Hobbs also testified in her deposition that she was aware that she would be required to meet the quarterly sales quotas in her 2007 and 2008 compensation plans. It is undisputed, and Hobbs concedes, that from Q2 2007 to Q2 2008, she failed to meet the sales quotas in her 2007 and 2008 compensation plans as an enterprise salesperson. Thus, by Hobbs's own admission, at the time she was first approached about moving to channel sales, she had yet to meet the sales quota requirements for the enterprise sales position.

Hobbs's evidence that Webb believed she would do well as a channel salesperson and evidence that she achieved her quota in Q4 2008 as a channel sales employee is not evidence that she was qualified for the enterprise sales position.  Likewise, evidence that Ashburn had a good working relationship with Hobbs in her role as a channel sales person is not evidence that she was qualified for the enterprise sales position.  Finally, the court disagrees with Hobbs's assertion that her knowledge of Ketera's products alone qualified her for the enterprise sales position.  Webb's recorded testimony relied on by Hobbs makes clear that she was expected, but failed, to use this knowledge to sell Ketera's products and meet her agreed upon sales goals: "we've got this talented person here but yet on the other hand, performance is not great."  Pl.'s Resp. App. 072, ln. 4-6.  Furthermore, as explained below, Hobbs's contention that she outperformed her male counterparts is unavailing.

### ii.      Whether Ketera Treated Others Similarly Situated but Outside the Protected Class More Favorably

Hobbs acknowledged in her deposition that only one of the several male enterprise salespersons, Blando, was still employed by Ketera at the time she was approached about the channel sales position.  Although Blando had not met any of his sales quotas when Hobbs was approached in the summer of 2008 about transferring to channel sales, he had only been with the company approximately six months, whereas Hobbs had been with Ketera over a year.  As a result, the court agrees with Ketera's argument that Hobbs and Blando are not similarly situated or "nearly identical" for comparison purposes.  *See Okoye v. University of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 514 (5th Cir. 2001).

Moreover, unlike Hobbs, none of the male salespersons was allowed to transfer to channel sales or another Ketera department before being fired for failure to meet their sales quotas. Additionally, Blando was given only one year to prove himself before being fired, Schwabrow was given eight months, and Coltman was given less than five months both of the times he was hired and fired by Ketera in 2007 and 2009, whereas Ketera waited a year and a half before moving Hobbs to channel sales and almost two years before terminating her employment.

Because Hobbs cannot establish all of the elements of a prima facie case, Ketera is entitled to judgment as a matter of law on her discrimination claim that Ketera unlawfully demoted her to channel sales and reduced her pay on the basis of her sex or pregnancy, and the court need not address the parties' remaining contentions regarding this claim.

> **b.    Ketera's Alleged Replacement of Hobbs and Failure to Compensate Her at the Same Rate as Coltman and Schwabrow**

Hobbs contends that she was "replaced" by the two male enterprise salespersons, Coltman and Schwabrow, that were hired by Ketera in January 2009, while Hobbs was on maternity leave. Hobbs also contends that upon returning to work after her maternity leave, she was transferred back to enterprise sales, but she was not returned to her prior salary of $120,000 and was paid less than Coltman and Schwabrow.  Ketera disputes whether Hobbs was returned to the same enterprise sales position she had before she was moved to channel sales, and contends based on Rapp's testimony that Hobbs's new role was a hybrid channel/enterprise sales position.  Ketera also contends that Hobbs's argument that she was "replaced" based on her declaration testimony is misleading because Hobbs admitted in her deposition that she had no personal knowledge of whether she was replaced by Coltman and Schwabrow.  Ketera further asserts that other than Hobbs's declaration testimony

on this issue, which it contends is misleading, there are no written records to substantiate her assertion that she was moved back to enterprise sales after returning to work in February 2009. For example, Ketera notes that there is no evidence of a 2009 compensation plan or other written documentation that shows Hobbs was returned to enterprise sales.

Even assuming that Hobbs was returned to enterprise sales, the court concludes for similar reasons that she has not established a prima facie case as to this claim. Evidence that she met her quota in Q4 2008 as a channel salesperson is not evidence that she was qualified for an enterprise sales position. Moreover, the records produced by Ketera that both parties rely on, together with other evidence, establish that renewal sales such as the Master Services sale made by Hobbs in December 2008, are not credited in the same manner by Ketera's enterprise sales department. The court therefore determines that Hobbs has failed to establish that she was qualified for the enterprise sales position.

Additionally, although Hobbs presented some evidence that Ketera refused to pay her the same salary as Colt and Schwabrow, there is no evidence that Hobbs's quota requirements and other job responsibilities were the same or similar to Coltman and Schwabrow. This is particularly important since the record reflects that not all enterprise salespersons had the same quotas and the quotas and compensation plans for enterprise salespersons changed from year to year. For example, Coltman's quarterly quotas for 2009 ranged from $500,000 to $700,000, which is significantly higher than any of Hobbs's quotas, and Coltman's $110,000 salary was less than what Hobbs received as an enterprise sales employee. There is no evidence in the record regarding Hobbs's quotas for 2009 upon returning to work; nor is there any evidence regarding Schwabrow's quotas

for 2009.  The court therefore concludes that Hobbs has failed to establish that Coltman and Schwabrow were similarly situated.  Because Hobbs cannot establish all of the elements of a prima facie case, Ketera is entitled to judgment as a matter of law on her discrimination claim that Ketera unlawfully replaced her with Coltman and Schwabrow and failed to compensate her at the same rate.

### c.    Termination of Employment

Although Hobbs contends, and it is undisputed, that she was fired within a short time after returning to work in February 2009, her claim that her employment was terminated fails for the same reasons her other sex discrimination claims fail, that is, she failed to raise a genuine dispute of material fact as to whether she was treated differently by Ketera treated than male employees who were similarly situated to Hobbs at the time her employment was terminated.  Moreover, for the reasons later explained, temporal proximity alone is not sufficient at the pretext stage.  Ketera is therefore entitled to judgment as a matter of law on this claim.

### B.    Hobbs's FMLA Claims

Under the FMLA, an eligible employee is allowed to take up to 12 work weeks of leave in a twelve-month period because of the birth of a child.  29 U.S.C. § 2612(a)(1); *Bocalbos v. National Western Life Ins. Co.*, 162 F.3d 379, 383 (5th Cir. 1998), *cert. denied*, 528 U.S. 872 (1999).  The FMLA makes it unlawful for an employer to interfere with, restrain, or deny an employee's FMLA rights, or to discriminate or retaliate against an employee for exercising such rights.  29 U.S.C. § 2615(a)(1)-(2); *Chaffin v. John H. Carter Co.*, 179 F.3d 316, 319 (5th Cir. 1999).  In her Complaint, Hobbs alleged interference and retaliation claims under the FMLA.

1.      **FMLA Interference Claim**

Hobbs contends that Ketera "interfered with, restrained, or denied Hobbs [sic] exercise or attempts to exercise her rights protected by the FMLA."[5]  Compl. 8, ¶ 64.  The FMLA does not define "interference," but Department of Labor regulations provide that interference with the exercise of an employee's rights includes not only refusing to authorize FMLA leave but also discouraging an employee from using such leave.  29 C.F.R. § 825.220(b).  Ketera contends that it is entitled to summary judgment on Hobbs's interference claim because Hobbs admits she received all of the maternity leave requested, including the additional two weeks requested.  For support, Ketera cites *Arismendiz v. University of Texas at El Paso*, 536 F. Supp. 2d 710, 716 (W.D. Tex. 2008) for the proposition that "[a] plaintiff suffers no FMLA injury when she receives all the leave she requests."  Def.'s Mot. 20.  Ketera further asserts that Hobbs's secretly recorded conversation with Webb demonstrates that it was supportive and never tried to discourage her from taking leave.  Additionally, Ketera contends that because Hobbs did not address her interference claim or Ketera's related arguments, she waived the claim.  Without seeking leave of court, Hobbs filed a sur-reply in which she asserts that although she did not use "magic words" in addressing Ketera's contentions, she discussed Ketara's failure "to return [Hobbs] to an equivalent position under the family Medical Leave Act [a]nd how [t]his is a denial of the substantive protections provided to employees under the Family Medical leave [sic] Act."  Pl.'s Sur-Reply, 6.

---

[5] This allegation appears to be based on the statutory language in  29 U.S.C. § 2615(a)(1).  The court notes, however, that Hobbs's Complaint is not verified and contains no factual allegations to support the assertion that Ketera "interfered with, restrained, or denied Hobbs [sic] exercise or attempts to exercise her rights protected by the FMLA."

Failure to respond to a summary judgment does not amount to waiver of a claim or automatically entitle the movant to judgment. A close review of Hobbs's response nevertheless reveals that her arguments go to whether Ketera retaliated against her for taking maternity leave, not whether Ketera interfered with her alleged right to take leave under the FMLA. Thus, while this argument by Hobbs in her reply brief may be relevant to her FMLA retaliation claim, the court determines that it is not relevant to her interference claim. Moreover, there is no evidence to support her assertion that Ketera denied or interfered with her exercise of rights under the FMLA; rather, it is undisputed that Hobbs requested and was permitted to take maternity leave. Accordingly, the court determines that no genuine dispute of material fact exists regarding Hobbs's FMLA interference claim under 29 U.S.C. § 2615(a)(1), and Ketera is entitled to judgment as a matter of law on this claim.

## 2.    FMLA Retaliation Claim

For an employee who has no direct evidence of retaliation, the familiar burden-shifting analysis applied in Title VII cases applies to FMLA cases. *Chaffin*, 179 F.3d at 319. Under the evidentiary analysis first developed by the Supreme Court in *McDonnell Douglas*, Hobbs must first set out a *prima facie* case of retaliation by showing that (1) she is protected under the FMLA; (2) she suffered an adverse employment action; and (3) other employees who did not request FMLA leave were treated more favorably than she, or that the adverse decision was made because of her request for leave. *Chaffin*, 179 F.3d at 319. If Hobbs successfully establishes her *prima facie* case, the burden then shifts to Ketera to articulate a legitimate, nonretaliatory reason for Hobbs's discharge. *Id.* at 319-20. In addition, "where there is a close timing between an employee's protected activity

and an adverse employment action, the employer must offer a legitimate, nondiscriminatory reason that explains both the adverse action and the timing." *Shackelford*, 190 F.3d at 408 (citation and quotation omitted).  If it successfully does so, then the burden shifts back to Hobbs, and she must set forth evidence showing that Ketera's stated reason for its action is pretextual, meaning that the proffered reason is false or that an intent to retaliate was the real reason for its decision. *Id.* at 320. In other words, a "plaintiff can survive summary judgment by producing evidence that creates a jury issue as to the employer's discriminatory animus or the falsity of the employer's legitimate nondiscriminatory explanation." *Sandstad*, 309 F.3d at 897.  This requires the plaintiff to demonstrate that the adverse employment action would not have occurred "but for" the protected activity. *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001).

Ketera contends that it is not an employer under the FMLA statute and, as a result, cannot be liable.  Ketera further contends that even if it qualifies an employer and had the requisite number of employees during the relevant years in question, Hobbs cannot establish that she was treated less favorably than anyone else who did not request leave or that Ketera took any action against her because of her leave.  According to Ketera, Hobbs was discharged for repeatedly failing to meet her quotas and her poor attitude.  Hobbs contends that its decision to hire Coltman and Schwabrow as enterprise salespersons while Hobbs was on maternity leave is not evidence she was replaced in violation of the FMLA.

Hobbs disagrees with Ketera's assertion that it is not an employer under the statute and contends that Ketera has failed to meet its burden of establishing this fact.  Hobbs contends that Ketera violated the FMLA by failing to restore her to an equivalent position upon her return from

maternity leave and terminating her employment.  In addition, she contends that Ketera failed to

follow its own employment procedures by not terminating all employees who failed to meet their

quotas.  Hobbs further asserts that Ketera's reasons for terminating her are not credible, because

Ketera originally told Hobbs she was being laid off for financial reasons but now maintains that she

was let go because of her performance and attitude.

Ketera counters that it was not required to provide Hobbs with every reason for her discharge,

and she fails to cite any authority to demonstrate that this is evidence of pretext.  Ketera further

contends that temporal proximity alone is not sufficient to establish pretext after an employer has

come forward with a nondiscriminatory reason for its decision. Regarding Hobbs's internal policy

argument, Ketera asserts that Hobbs admitted in her deposition that all of the male salespersons hired

while she was on pregnancy leave were terminated for poor performance in shorter time periods than

Hobbs.

The "[f]ailure to follow internal procedures is generally not enough to create a genuine issue

of fact as to discriminatory motives." *Grubb v. Southwest Airlines*, 296 F. App'x 383, 396 (5th Cir.

2008); *Moore v. Eli Lilly & Co.*, 990 F.2d 812, 819 (5th Cir.1993).  Likewise, even assuming that

Hobbs can survive the prima facie stage, temporal proximity alone is insufficient at the pretext stage.

*See Strong v. Univ. HealthCare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007).  The court

concludes that Ketera put forth a legitimate reason for the employment action[6] and that Hobbs fails

---

[6] As noted by Hobbs, Ketera asserted a number of reasons for her termination, including financial reasons, Hobbs's failure to meet quotas, and her poor attitude.  Regarding the timing of Hobbs's termination, Ketera asserted, and Hobbs does not dispute, that she failed to make any sales in the period of time after she returned from maternity leave before her employment was terminated.  As noted herein, Hobbs contends that Ketera's reasons for firing her are pretextual.

to show a genuine dispute of material fact that the reason was pretextual.  *See id.*  Although the record reflects that Hobbs's employment was terminated after she achieved her channel sales quota before taking maternity leave, there is insufficient evidence to rebut Ketera's assertion regarding Hobbs's poor attitude or the company's financial situation.   Hobbs argues that she had a good working relationship with Webb and Ashburn.  The evidence, however, demonstrates, and Hobbs does not dispute, that it was Savignano who made the decision to terminate her employment.  Hobbs also acknowledges that Savignano testified that "he believed [Hobbs] took the 'opportunity' to work in channel sales, but never intended to actually perform the role."  Pl.'s Resp. 10.  This is further evidence that Savignano continued to have doubts about Hobbs's attitude and commitment before she was moved to channel sales.

Hobbs's recorded conversation similarly demonstrates that Savignano wanted to discharge Hobbs as early as mid-2008, long before Hobbs inquired about FMLA leave, due to what he perceived as a poor attitude and miscommunications.   During this same conversation, Webb indicated that Ketera was experiencing financial difficulty because of salaries exceeding sales. Together, this evidence undermines Hobbs's reliance on temporal proximity.  *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272-74 (2001) (per curiam) (holding that where evidence showed plaintiff's supervisor considered transferring plaintiff the day before she was served with plaintiff's lawsuit, there was no causal connection showing that the transfer was retaliatory). Without temporal proximity, Hobbs's argument regarding Ketera's alleged failure to follow internal employment procedures is not sufficient to create a genuine dispute of material fact as to Ketera's discriminatory

motives.  Accordingly, Hobbs has failed to meet her burden of establishing that Ketera's decision to terminate her employment would not have occurred "but for" her pregnancy leave.

The court further determines that Hobbs's argument regarding Ketera's alleged failure to restore her to an equivalent position upon returning from maternity leave is without merit.  It is undisputed that Hobbs was in a channel sales position before going on maternity leave.  Thus, Ketera was only required to return her to a channel sales position or some equivalent position.  According to Hobbs, she received the same salary upon returning from maternity leave, and she was moved to enterprise sales, a position that she considered to be higher than channel sales.  While the parties dispute whether she was placed in enterprise sales or a hybrid channel/enterprise sales position, there is no evidence to support her assertion that she was not returned to an equivalent position.  To the extent Hobbs contends that Ketera's discharging her amounted to not returning her to an equivalent position, the court has already addressed this issue.

At most, Hobbs's evidence indicates that Ketera may have done a poor job in handling her termination, which does not speak well for it handling employee relations, but that does not show intentional discrimination because of her pregnancy.  Accordingly, the court concludes that Hobbs failed to come forward with evidence  such that a reasonable jury could return a verdict in her favor and thus failed to raise a genuine dispute of material fact as to her FMLA claim.  Ketera is therefore entitled to judgment as a matter of law.  In making this decision, the court does not consider the appropriateness of Ketera's business decisions.  It focuses only on whether there has been discriminatory or retaliatory conduct under the FMLA.  Having determined that Hobbs's claim fails

for other reasons, the court need not address the parties' contentions regarding Ketera's employer status under the statute as they are moot.

### C.    Breach of Contract Claim and Equitable Claims to Recover Commissions

Ketera contends and Hobbs admits that payment of commissions was contingent on Ketera being able to collect from its customers for sales made, and to be eligible for commissions, Hobbs also had to be employed by Ketera when payments were received from customers.  Hobbs nevertheless asserts that it was her understanding that payment was received by Ketera when her commission statements reflected the amount of commissions earned.  She presents no evidence to support her understanding in this regard; therefore it is only a subjective belief, which is inadequate to raise a disputed issue of material fact.  Furthermore, there is no evidence in the record that Ketera received payment before Hobbs's employment was terminated.  Accordingly, Hobbs has failed to raise a genuine dispute of material fact regarding her contract claim for unpaid commissions.

Regarding Hobbs's quantum meruit and estoppel claims, Ketera argues that Hobbs is not entitled to equitable relief because both claims assume the absence of a contract and any commissions due and owing to Hobbs were covered by the parties' agreements as reflected in her 2007 and 2008 compensation plans.  Hobbs acknowledges that these claims were pled in the alternative, in the event the court declined to find that the commission statement was a part of her valid contract with Ketera.

Neither party contends that the compensation plans at issue are ambiguous, and the court concludes that they are not ambiguous since the provisions at issue are clear and not susceptible to more than one reasonable interpretation. As a result, the court cannot consider Hobbs's parol

evidence to contradict the unambiguous language in the compensation plans.  *See Balandran v. SafeCo Ins. Co.*, 972 S.W.2d 738, 741 (Tex. 1998).  The court further agrees with Ketera that Hobbs's quantum meruit and estoppel claims fail because her compensation plans expressly cover the terms by which the parties agreed that Hobbs would be entitled to commissions.  *See Subaru of America, Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 226 (Tex. 2002) ("promissory-estoppel doctrine presumes no contract exists"); *Fortune Production Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000) ("Generally speaking, when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory. . . . Accordingly, when a party claims that it is owed more than the payments called for under a contract, there can be no recovery for unjust enrichment 'if the same subject is covered by [the] express contract.'") (citations omitted).  The court therefore concludes that Hobbs has failed to raise a genuine dispute of material fact regarding her quantum meruit and estoppel claims, and Ketera is entitled to judgment as a matter of law on these claims.

## IV.  Evidentiary Objections by the Parties

Ketera objects and contends that portions of Hobbs' declaration submitted in support of her response to Ketera's summary judgment motion should be stricken because it contradicts her deposition testimony and is objectionable for other reasons.  Hobbs objects to the declaration testimony of Ketera's counsel regarding Ketera's employer status based on review of documents produced.  In any event, the court only considered evidence that is admissible pursuant to Rule 56 of the Federal Rules of Civil Procedure and the summary judgment standard herein enunciated.  As

the court relied only on admissible evidence, it **overrules** both parties' objections and **denies as moot** Defendant's Objections and Motion to Strike Portions of Declaration of Rachel B. Hobbs.

## V.        Conclusion

For the reasons herein stated, the court determines that no genuine dispute of material fact exists as to any of Hobbs's claims.  Accordingly**,** the court **grants** Defendant's Motion for Summary Judgment, and **dismisses** this action **with prejudice**.  Defendant's Objections and Motion to Strike Portions of Declaration of Rachel B. Hobbs are **overruled** and **denied as moot**.  The court, as required by Rule 58 of the Federal Rules of Civil Procedure, will issue judgment by separate document.

**It is so ordered** this 30th day of March, 2012.


_____
Sam A. Lindsay
United States District Judge